## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| NORTHSTAR VERMONT YANKEE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-1209C |
| | ) | |
| v. | ) | Filed: April 6, 2022 |
| | ) | Reissued: April 21, 2022[1] |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

This is the third round of litigation related to the Department of Energy's ("DOE") continuing breach of its contractual obligation to accept spent nuclear fuel ("SNF") from the Vermont Yankee Nuclear Power Station ("VYNPS") and store it permanently in a government-operated repository. Plaintiff NorthStar Vermont Yankee, LLC ultimately was awarded $40,739,217 in damages (plus $46,545.47 in statutory costs) in the first round of litigation, which covered the period prior to April 30, 2008.[2] *See Entergy Nuclear Vt. Yankee, LLC v. United States*, No. 03-2663C (Fed. Cl. filed Nov. 12, 2003). In the second round of litigation, the parties stipulated to an award of $19,144,174 in damages for the period of May 1, 2008, through December 31, 2013. *See Entergy Nuclear Vt. Yankee, LLC v. United States*, No. 14-343C (Fed. Cl. filed

---

[1] The Court issued this opinion under seal and directed the parties to confer and propose any redactions by April 18, 2022. Because the parties did not propose any redactions, the Court reissues this opinion in full.

[2] In the prior litigation, Plaintiff was identified as Entergy Nuclear Vermont Yankee, LLC. Pursuant to a transaction that closed on January 11, 2019, the ownership and name of Plaintiff, as well as the holder of the Standard Contract, changed to NorthStar Vermont Yankee, LLC. Def.'s App. 43, ECF No. 46-1.

April 24, 2014).  Plaintiff seeks $191,471,150 in this action for costs incurred for the period of January 1, 2014, through December 31, 2018.

Before the Court is Plaintiff's Motion for Partial Summary Judgment and Entry of Partial Final Judgment, as well as Defendant's Motion for Partial Summary Judgment.  The parties' motions raise a variety of issues, some of which are overlapping, including (i) Plaintiff's entitlement to judgment and entry of partial final judgment on the undisputed portion of its damages claim, (ii) whether Plaintiff should be judicially estopped from asserting certain acceptance allocation figures that differ from the figures asserted in round one, (iii) questions of contract interpretation regarding disposal of short-cooled fuel and regarding the requirements for exchanges, and (iv) whether Plaintiff can recover payments it made to the town of Vernon, Vermont, and pre-2017 site security costs.  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** both motions.

## BACKGROUND

### I.    Factual Background

Through the enactment of the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 96 Stat. 2201 (1982) (codified at 42 U.S.C. §§ 10101–10270), Congress created a SNF disposal program that required DOE and domestic nuclear utilities to enter into a Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste ("Standard Contract").  *Energy Nuclear Vt. Yankee, LLC v. United States* ("*ENVY*"), 95 Fed. Cl. 160, 169 (2010).  This contract provides for DOE's acceptance and disposal of the utilities' SNF, beginning no later than January 31, 1998, in

exchange for the utilities' payment of fees into the Nuclear Waste Fund established to support the disposal activities. *Id.*; *see* Def.'s App. ("DA") 107, ECF No. 46-1.[3]

The Standard Contract does not establish a specific schedule or rate by which DOE is obligated to accept and dispose of SNF. Instead, for planning purposes, DOE was required by the contract to release an annual capacity report setting forth the projected annual receiving capacity for the first 10 years of operation at the planned DOE repository and an annual acceptance priority ranking ("APR") establishing the order in which it would collect SNF from the facilities beginning with the oldest discharged fuel. *ENVY*, 95 Fed. Cl. at 170; *see* DA 111. DOE and the utilities would then use the delivery schedule procedures provided in the Standard Contract to agree to a schedule for each facility's delivery of SNF to DOE. DA 111–12. Under those procedures, the utilities must furnish to DOE a delivery commitment schedule ("DCS"), which identifies all SNF a utility wants to deliver to DOE beginning 63 months thereafter. DA 112. The Standard Contract allows DOE the discretion to approve or disapprove the submitted DCSs as well as revised schedules (if they are initially denied) within three months of receipt. *Id.* A similar process is used to agree upon a final delivery schedule, which must be submitted to DOE at least 12 months prior to the delivery date. DA 112–13. In the event that DCSs for SNF (and/or high-level waste ("HLW")) require the disposal of material beyond the annual capacity of DOE's disposal repository, DOE will follow an acceptance priority based on the age of the discharged fuel. DA 115–16. This scheme became known as "oldest fuel first" ("OFF").[4] *ENVY*, 95 Fed. Cl. at 170.

---

[3] For ease of reference, this opinion refers to the bates-numbered pages of Defendant's Appendix, rather than the ECF page number.

[4] A utility is not required by the contract to actually deliver its SNF to the DOE in an oldest-fuel-first order. The OFF priority ranking merely assigns a utility a place in the queue. It can then use its allocation to deliver any fuel that meets the criteria of the Standard Contract. *See* DA 115–16; *see also Yankee Atomic Power Co. v. United States*, 94 Fed. Cl. 677, 695–96 (2010), *aff'd in part, rev'd in part*, 679 F.3d 1354 (Fed. Cir. 2012).

The Standard Contract also allows utilities to exchange approved DCSs.  DA 113. According to the contract terms, DOE retains the right to approve or disapprove, in its sole discretion, an exchange request.  *Id.*  A utility wanting to exchange an approved DCS must submit such request to DOE, identifying the priority rankings of the utilities intending to engage in the exchange.  DA 114.  DOE then has 30 days to approve or disapprove of the proposed exchange, advising the requesting utility of the reasons for disapproval in the event DOE exercises its discretion to deny the request.  *Id.*

As the parties well know, DOE did not begin accepting SNF in January 1998.  The United States Court of Appeals for the Federal Circuit later determined that DOE's delay in accepting and disposing of SNF constituted a breach of the Standard Contract.  *See Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005).  The Court held that the delay qualified only as a partial breach based on the agency's stated intent to perform under the terms of the Standard Contract in the future.  *Id.* at 1376–77.  Pursuant to that decision, utilities that are damaged by DOE's delayed performance are required to submit damages claims every six years and may not seek future damages.  *Id.* at 1376–78.

Unsurprisingly, litigation has ensued over what damages are properly recoverable in SNF cases.  For purposes of calculating damages under the OFF rubric of the Standard Contract, the Federal Circuit established a minimum acceptance rate based on a report DOE submitted to Congress in 1987, dictating the minimum amount of SNF that otherwise would have been accepted by DOE but for the agency's delay.  *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1292 (Fed. Cir. 2008) (finding the 1987 report "provides the best available pre-breach snapshot of both parties' intentions for an acceptance rate").  The Court subsequently approved another damages model based on utilities' hypothetical participation in the exchange of acceptance allocations—

4

*i.e.*, "the exchanges market." *See, e.g.*, *Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1369 (Fed. Cir. 2011). Under this theory, utilities have argued that in the "but-for world" where DOE began accepting SNF in 1998, as obligated by the contract, an exchanges market would have existed where utilities with later approved DCSs would bargain with utilities holding earlier DCSs to remove SNF from their facilities in a more expedited fashion than would be permitted under the OFF scheme. *Id.*

On June 10, 1983, Vermont Yankee Nuclear Power Corp., Plaintiff's predecessor, entered into the Standard Contract with DOE under which DOE agreed to accept and deliver SNF from VYNPS. *See* DA 102; *ENVY*, 95 Fed. Cl. at 167. VYNPS is a single unit boiling water reactor site located in Vernon, Vermont. DA 44. Since DOE's breach of the Standard Contract, Plaintiff has relied on both wet pool and dry rack storage (referred to as the Independent Spent Fuel Storage Installation "ISFSI") at VYNPS to store SNF that otherwise should have been accepted and disposed of by DOE but for the breach. DA 44–46; *see ENVY*, 95 Fed. Cl. at 174–75. In August 2013, Plaintiff publicly announced the closure of VYNPS and permanently ceased power operations in December 2014. DA 44. As a result, Plaintiff began offloading SNF assemblies from the reactor core into the spent fuel pool beginning in January 2015. *Id.* By August 1, 2018, Plaintiff removed the last of the SNF at the facility from the spent fuel pool and loaded the SNF into storage cannisters which were placed on the ISFSI. DA 45.

## II.   Procedural Background

On September 10, 2021, both parties filed motions for partial summary judgment. *See* Pl.'s Mot. for Partial Summ. J. and Entry of Partial Final J., ECF No. 45; Def.'s Mot. for Partial Summ. J., ECF No. 46. Plaintiff requests partial summary judgment with respect to: (1) DOE's obligation to accept "short cooled fuel"—*i.e.*, fuel cooled for less than five years—as specified by the terms

of the Standard Contract, and (2) the undisputed portion of Plaintiff's claimed damages.  *See generally* ECF No. 45; Pl.'s Reply, ECF No. 49.  Plaintiff also requests that the Court enter final partial judgment in the amount of the undisputed damages pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims ("RCFC").  *See* ECF No. 45 at 13–18.

Conversely, Defendant seeks partial summary judgment with respect to: (1) whether the Court should apply the judicial estoppel doctrine to preclude Plaintiff from asserting different acceptance allocation figures for the period of 1998–2008 under its current exchanges-based model than were asserted in round one using the OFF scheme, (2) the Standard Contract's requirements that fuel be cooled a minimum of five years before it can be delivered and that only approved DCSs are eligible for exchange, and (3) whether Plaintiff can recover payments made by Plaintiff to the town of Vernon and pre-2017 site security costs it allocated to mitigation efforts.  *See generally* ECF No. 46; Def.'s Reply, ECF No. 50.

## DISCUSSION

### I.    Standard of Review

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A fact is material when it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine, thus necessitating a trial, when a finder of fact may resolve factual issues in favor of either party.  *Id.* at 250.

"When deciding a summary judgment motion, all of the nonmovant's evidence is to be credited, and all justifiable inferences are drawn in the nonmovant's favor."  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 671 (Fed. Cir. 2000) (citing *Anderson*, 477 U.S. at 255); *see Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).  Where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Anderson*, 477 U.S. at 248. "With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). The moving party bears the burden of proving the absence of a genuine dispute of material fact but "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power*, 16 F.3d at 1202 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## II. Plaintiff Is Entitled to Partial Summary Judgment for the Undisputed Portion of Its Damages Claim but Not Entry of Partial Final Judgment.

Plaintiff seeks both summary judgment and entry of partial final judgment as to the undisputed portion of its damages claim, which amounts to $135,892,413. *See* ECF No. 45 at 12–13; ECF No. 49 at 5. In its opposition brief, Defendant acknowledges that it does not contest Plaintiff's entitlement to this portion of its total claimed damages resulting from DOE's breach of the Standard Contract.[5] Def.'s Resp. to Pl.'s Mot. at 6 n.1, ECF No. 48; *see Ind. Mich. Power*, 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002) (plaintiff may recover damages in a breach of contract action that are reasonably foreseeable at the time of contracting, caused by the breach, and shown with reasonable certainty). Based on

---

[5] Plaintiff initially identified $135,034,217 as the undisputed costs, citing a report prepared by Defendant's expert, Robert Peterson. ECF No. 45 at 12; *see* Report of Robert A. Peterson at 37, ECF No. 45-4. Defendant, however, provided the revised uncontested damages figure in its opposition brief, representing that the revised amount will be reflected in an updated report to be produced to Plaintiff as soon as practicable. Def.'s Resp. to Pl.'s Mot. at 6 n.1, ECF No. 48.

expert testimony it intends to offer, Defendant expects to contest at trial only $55,578,737 of Plaintiff's total request for damages.  ECF No. 48 at 6 n.1.

Other judges of this court have routinely entered partial summary judgment in SNF cases involving similar circumstances.  *See, e.g.*, *Ga. Power Co. v. United States*, 143 Fed. Cl. 750, 755 (2019) (holding summary judgment was appropriate with respect to approximately $143 million of undisputed damages); *Conn. Yankee Atomic Power Co. v. United States*, 142 Fed. Cl. 87, 90 (2019) (granting partial summary judgment with respect to approximately $103 million of undisputed damages).  Indeed, Defendant does not meaningfully dispute that partial summary judgment on this issue is appropriate.  *See generally* ECF No. 48.  Accordingly, construing all evidence and reasonable factual inferences in the light most favorable to Defendant, as the nonmovant, the Court finds that Plaintiff has demonstrated the absence of a genuine dispute as to material fact and is therefore entitled to summary judgment with respect to $135,892,413 in claimed damages.

Although the Court agrees with Plaintiff as to the appropriateness of partial summary judgment, it does not share the same opinion with respect to entry of partial final judgment in the amount of these uncontested damages.  *See* ECF No. 45 at 14–18; ECF No. 49 at 11.  As Defendant correctly argues, a Rule 54(b) judgment is not appropriate because judgment as to one aspect of damages does not finally resolve Plaintiff's single breach of contract claim.  *See* ECF No. 48 at 6.

RCFC 54 provides that when "an action presents more than one claim for relief[,] . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay."  RCFC 54(b).  Whether partial judgment under RCFC 54(b) is appropriate requires a two-part analysis.  First, "the judgment must be final with respect to one or more claims."  *Houston Indus. Inc. v. United States*, 78 F.3d 564,

567 (Fed. Cir. 1996) (citing *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 742–43 (1976)). "The resolution of individual issues within a claim does not satisfy the requirements of Rule 54(b)." *Id.*; *see W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.*, 975 F.2d 858, 861–62 (Fed. Cir. 1992) (holding that a "judgment is not final for Rule 54(b) purposes unless it is 'an *ultimate* disposition of an *individual* claim entered in the course of a multiple claims action.'" (emphasis in original) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956))). Second, considering "the judicial administrative interests as well as the equities involved," the Court must determine that there is "no just reason for delay." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980).

Despite advancing a single breach of contract claim, *see* Pl.'s Compl. at 11 ("Claims for Relief"), ECF No. 1, Plaintiff contends that entry of partial final judgment as to the uncontested portion of damages is warranted. According to Plaintiff, viewing the "whole lawsuit" as a "single, non-segregable" claim is "overly formulaic and restrictive, and 'makes little sense' in the context of . . . spent nuclear fuel damages cases." ECF No. 45 at 15; *see* ECF No. 49 at 7 ("There is no reason that the alleged 'lone claim' could not also be divided for resolution into separate components based upon finality and the absence of any dispute regarding quantum or entitlement.").

Plaintiff asserts that its argument is analogous to the facts of *Stockton East Water District v. United States*, 120 Fed. Cl. 80, 82–83 (2015), and *Bell BCI Corp. v. United States*, 91 Fed. Cl. 664, 666 (2010). *See* ECF No. 45 at 15. In those cases, the trial courts entered partial judgment as to portions of the plaintiffs' damages awards affirmed by the Federal Circuit even though other portions of the awards would be reexamined during the remand proceedings. *See Stockton*, 120 Fed. Cl. at 83; *Bell BCI*, 91 Fed. Cl. at 667. As Defendant emphasizes, each court's finding that

9

Rule 54(b) relief was warranted relied specifically on the posture of the cases, citing binding precedent approving the entry of partial judgment in similar remand postures.  *See Stockton*, 120 Fed. Cl. at 83 (holding that a trial court may on remand enter partial final judgment "as to a sum certain in damages for which a defendant is liable as a result of the court of appeals['] mandate, even if the remand order requires the trial court to adjudicate other requests for damages by plaintiff arising out of the same legal claim." (citing *King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560 (Fed. Cir. 1987)); *Bell BCI*, 91 Fed. Cl. at 668 (citing *King Instrument*, 814 F.2d at 1563).  As that precedent explains, "Rule 54(b), which concerns the power of the trial court *before* appeal, is not applicable" in the remand posture presented in *Stockton* and *Bell BCI*.  *King Instrument*, 814 F.2d at 1563 (emphasis in original).

The procedural posture of the instant case is quite different.  Here, there has been no affirmance of any aspect of Plaintiff's damages claim and no mandate from the Federal Circuit by which the Court may exercise authority to enter partial final judgment as to a sum certain in damages.  Nor is the Court's order granting summary judgment on the uncontested portion of damages necessarily a functional equivalent.  *Compare Bell BCI*, 91 Fed. Cl. at 668–69 (finding partial judgment was warranted because "[t]he [Federal Circuit's] decision on the affirmed claims is final, the Government's liability is established, these claims will have no possible effect on the remand proceedings, and the claims will never again be reviewed on appeal."), *with Entergy Nuclear Generation Co. v. United States*, 138 Fed. Cl. 317, 323 (2018) (rejecting request to enter partial judgment on uncontested damages in a SNF case even where the Government represented that it would not appeal that amount).  Moreover, Defendant represents that it intends to seek an offset to Plaintiff's disputed damages in the amount of at least $1.5 million, and perhaps more depending on the resolution of other issues in the parties' motions.  *See* ECF No. 48 at 11–12.

Although a relatively nominal amount compared to the $55.5 million in dispute, that offset may factor into the ultimate accounting of damages further distinguishes the level of finality (or lack thereof) between this case, on the one hand, and *Stockton* and *Bell BCI*, on the other.

As Plaintiff acknowledges, with respect to SNF cases in a similar posture, decisions addressing the appropriateness of partial final judgment are split. In *Connecticut Yankee* and *Entergy Nuclear Palisades, LLC v. United States*, the courts issued partial judgments pursuant to RCFC 54(b) for the uncontested portions of damages, despite the existence of disputes with respect to the remainder of the requested damages and the fact that each plaintiff alleged only a single breach of contract claim. *See Conn. Yankee*, 142 Fed. Cl. at 90; *Entergy Nuclear Palisades v. United States*, 122 Fed. Cl. 225, 230 (2015). In two other cases, the courts denied requests for the entry of partial judgment in the exact same scenario. *See Ga. Power*, 143 Fed. Cl. at 757; *Entergy Nuclear Generation*, 138 Fed. Cl. at 325. Plaintiff "submits that the results in *Connecticut Yankee* and *Entergy Nuclear Palisades* represent the better rule for these spent nuclear fuel damages cases." ECF No. 45 at 16. The Court disagrees.

The Court finds the analyses in *Georgia Power* and *Entergy Nuclear Generation* more persuasive. As in *Georgia Power*, the Court is cognizant of the "equities involved in this case," including Defendant's long-established liability for DOE's partial breach, the undisputed nature of the damages at issue, and the inability of Plaintiff to recover interest while waiting for the entry of final judgment. 143 Fed. Cl. at 756. However, "to grant partial final judgment to [Plaintiff] on part but not all of the harms arising out of only its breach of contract claim would be to enter judgment on less than one claim, violating Rule 54(b)." *Entergy Nuclear Generation*, 138 Fed. Cl. at 322. Unless and until the Federal Circuit clearly indicates that the language of RCFC 54(b) permits the partial judgment sought by Plaintiff here (and in other SNF cases), the Court will

11

"hew[] closer to the Federal Circuit's articulated view in *Houston Industries*, 78 F.3d at 567, and consider[] the [undisputed] costs an individual issue within plaintiff['s] claim for breach of contract."[6] *Ga. Power*, 143 Fed. Cl. at 757. Accordingly, the Court denies Plaintiff's request for entry of partial final judgment.

## III. The Doctrine of Judicial Estoppel Does Not Preclude Plaintiff's Assertion of Certain Acceptance Allocation Figures Under Its Exchanges-Based Model.

Defendant argues that Plaintiff should be judicially estopped in this round of litigation from taking factual positions with respect to acceptance allocations for the years 1998 through 2008 that are inconsistent with factual positions previously taken by Plaintiff in the first round of litigation. ECF No. 46 at 15. Specifically, Plaintiff established damages in round one by demonstrating its use of acceptance allocations in the but-for world on an annual basis from 1998 through 2008 using the OFF scheme. *See id.* at 18–19. In this litigation, Plaintiff asserts an exchanges-based theory of recovery, relying on a model prepared by its expert, Frank Graves, to predict how Plaintiff would have exchanged acceptance allocations with other utilities to dispose of SNF at VYNPS more quickly. *See id.* at 17–18. Defendant emphasizes that this new model assumes different acceptance allocations for the years 1998 through 2008.[7]

---

[6] Because Plaintiff has failed to demonstrate the first prong of the RCFC 54(b) analysis, there is no need for the Court to determine the second prong—*i.e.*, whether there is no just reason for delay.

[7] Defendant provided a helpful table, reproduced below, to document the differences in the amounts of SNF accepted during the relevant period, measured in Metric Tons of Uranium ("MTUs"), according to each model.

| Year | First Round: MTUs Accepted by DOE | Current Round: MTUs Accepted by DOE |
|------|-----------------------------------|-------------------------------------|
| 1998 | 72.9 | 0 |
| 1999 | 0 | 0 |
| 2000 | 20.6 | 0 |
| 2001 | 27.5 | 9.5 |
| 2002 | 25.7 | 23.6 |
| 2003 | 39.2 | 0 |

Plaintiff argues, among other things, that judicial estoppel does not apply to this case because there is no "clear inconsistency" between the positions taken by Plaintiff with respect to the acceptance allocations in this and previous rounds of litigation, and any alleged inconsistencies neither provide Plaintiff an unfair advantage nor cause Defendant to suffer unfair prejudice in this case.  Pl.'s Opp'n to Def.'s Mot. at 16–17, ECF No. 47.  On these points, Plaintiff has the stronger argument.

"Judicial estoppel is an equitable doctrine that prevents a litigant from taking a litigation position inconsistent with one successfully asserted in an earlier court proceeding." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1378 (Fed. Cir. 2020).  Whether to apply judicial estoppel to preclude a party's claim is a matter within the court's discretion.  *Agility Pub. Warehousing Co. K.S.C.P. v. United States*, 969 F.3d 1355, 1368 (Fed. Cir. 2020) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996)).  Although not intending to "establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," the Supreme Court articulated three factors for courts to consider in evaluating the merits of a judicial estoppel argument.  *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001).  First, there must be clear inconsistency in the party's later position when compared to its previous position.  *Id.* at 750.  "To be 'clearly inconsistent,' positions must be 'mutually exclusive' and 'directly inconsistent.'"  *Egenera*, 972 F.3d at 1379 (quoting *RFF Family P'ship v. Ross*, 814 F.3d 520, 528 (1st Cir. 2016)).  Second, the party must have prevailed in persuading a court to adopt or accept its earlier,

| 2004 | 19.4 | 23.5 |
| 2005 | 41.4 | 66.2 |
| 2006 | 24.9 | 0 |
| 2007 | 25.1 | 0 |
| 2008 | 23.6 | 93.8 |

ECF No. 46 at 15.

inconsistent position.  *New Hampshire*, 532 U.S. at 750; *see Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 665 (Fed. Cir. 1988) (explaining that the invocation of judicial estoppel "depends upon [a party] having received a benefit from the previously taken position in the form of judicial success").  Third, the party must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751.  The crux of the parties' dispute here centers on the first and third *New Hampshire* factors.

On the first factor, Defendant focuses squarely on the annual acceptance figures determined in the first round of litigation through application of the OFF scheme.  This focus misses the forest for the trees because a mere difference in factual positions is not necessarily dispositive.  *See Egenera*, 972 F.3d at 1379 (finding patent owner's position that an individual was erroneously listed as an inventor on the patent not "clearly inconsistent" with later position that individual should be relisted as an inventor).  As both parties acknowledge, in SNF cases, the Government does not pay nuclear utilities for allocations.  *See* ECF No. 47 at 17; ECF No. 50 at 11 n.7.  Rather, the Government is liable for the real-world costs incurred by utilities during a claim period that were caused by DOE's breach, and causation is determined by looking to the "but-for world" in which DOE had accepted SNF through full performance of the Standard Contract.  *See Pac. Gas & Elec.*, 536 F.3d at 1292.  In each round of litigation, Plaintiff has consistently claimed that its costs are fully recoverable as a result of the breach—only the manner in which it has sought to substantiate its damages claim are different.  And if the costs incurred were fully recoverable regardless of whether the but-for world was defined using OFF or an exchanges-based model, then neither the theories of recovery nor their factual underpinnings are "mutually exclusive" or "directly inconsistent." *Egenera*, 972 F.3d at 1379; *see* ECF No. 47 at 16 ("[T]he government being liable under one (conservative, not disputed) approach to causation, when it would also be

liable for the exact same amount (if not more) under a second approach to causation, does not reflect the sort of inconsistency or 'mutually exclusive' positions contemplated by the cases that have enforced judicial estoppel."); Report of Frank C. Graves at 9 n.4, ECF No. 47-1.

Defendant concedes that Plaintiff is not judicially estopped from changing its theory of recovery in this case. *See* ECF No. 50 at 6. Rather, it argues that Plaintiff's current model must incorporate the factual positions taken in the prior, different model used in the first round. *Id.* The Court finds this argument difficult to reconcile, as a model for determining damages is not so easily deconstructed into theory versus fact. Plaintiff's current exchanges-based model is based entirely on the assumption of different facts—*i.e.*, that in the but-for world an exchanges market would have existed and VYNPS would have participated in it rather than following OFF. *See Dairyland Power*, 645 F.3d at 1369–71. Other than pointing out that the acceptance allocation figures under the two models are not the same for the years 1998 through 2008, Defendant does meaningfully explain why the Court can accept Plaintiff's new exchanges-based model but only by artificially limiting some data to the OFF rubric. *See* ECF No. 50 at 6–7. Defendant has cited no decisions in SNF cases raising similar concerns about factual inconsistency, even though the Federal Circuit in *Sacramento Municipal Utility District v. United States* ("*SMUD*") approved the use of the exchanges-based theory in a later round of that litigation where the nuclear utility successfully recovered damages under OFF in round one. 566 F. App'x 985, 995 (Fed. Cir. 2014). Defendant correctly notes that the issue addressed in *SMUD* was one of collateral estoppel, not judicial estoppel. ECF No. 50 at 7. It, however, does not contend that the factual differences resulting from the change of theories in *SMUD* were not also present in that case.

Even if there were clear inconsistency (as that term is understood in judicial estoppel cases), under the third *New Hampshire* factor the Court finds Defendant has not clearly articulated

the risk of Plaintiff gaining an unfair advantage or Defendant suffering from unfair prejudice if Plaintiff is not estopped from relying on different acceptance allocation figures for 1998–2008. *New Hampshire*, 532 U.S. at 751.  The only argument the Court can discern from Defendant's motion on the issue of unfair advantage is that Plaintiff "is using . . . allocations a second time to buttress its exchanges-based result."  ECF No. 50 at 11 n.7.  As Plaintiff's expert explains, however, utilizing an exchanges-based model in comparison to OFF would not result in higher aggregate damages claims by Plaintiff, "though it could lead to lower damages claims."  ECF No. 47-1 at 9 n.4.  The Court is not persuaded by Defendant's amorphous description of unfair advantage.

Moreover, the Court does not find that Plaintiff's current assertion of an exchanges-based theory of recovery (with different acceptance allocations) is an effort to manipulate or mislead the Court.  Judicial estoppel "is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts."  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) ("Judicial estoppel is not a sword to be wielded by adversaries unless such tactics are necessary to 'secure substantial equity.'" (quoting *Gleason v. United States*, 458 F.2d 171, 175 (3d Cir. 1972))); *see Kannuu PTY Ltd. v. Samsung Elecs. Co.*, 15 F.4th 1101, 1109 (Fed. Cir. 2021) (citing *United States v. Apple, Inc.*, 791 F.3d 290, 337 (2d Cir. 2015) ("[R]elief is granted only when the . . . impact on judicial integrity is certain." (alterations in original) (citation omitted))).  In the 15-year period between the filing of the complaints in round one and in this case, the legal framework for awarding damages in SNF cases has evolved.  *See, e.g.*, *Dairyland Power*, 645 F.3d at 1369–71; *SMUD*, 566 F. App'x at 995. Additionally, as Plaintiff explained at oral argument, there was no need in prior rounds of litigation

16

to demonstrate entitlement to damages through an exchanges-based model because OFF—the clear-cut, Circuit-approved theory—provided full recovery.  *See* Hr'g Tr. at 61:3–8, ECF No. 55. Plaintiff's strategic decision to proceed under OFF, rather than through exchanges, was explicitly spelled out in a joint stipulation filed in round two.  DA 252–53 (agreeing that the Standard Contract's exchanges provision was not relevant because Plaintiff demonstrated damages under OFF and reserving all rights and objections regarding exchanges-based damages theories for purposes of future litigation).  These circumstances reasonably explain why Plaintiff has now pivoted to a different damages model that assumes different acceptance allocations.  *See New Hampshire*, 121 S. Ct. at 1814 (citing 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981)); *Egenera*, 972 F.3d at 1379 (holding that intervening judicial rulings "further justif[ied] any seeming inconsistency" in a party's positions)).

The Court therefore exercises its discretion to deny Defendant's summary judgment request with respect to the issue of judicial estoppel.[8]

## IV.   The Plain Language of the Standard Contract Requires DOE to Accept Short-Cooled Fuel on the Same Delivery Schedule as Standard Fuel, Unless Technical Feasibility Concerns Require Schedule Adjustment.

The parties both seek summary judgment on their competing interpretations of the Standard Contract with respect to DOE's obligation to accept short-cooled fuel.  Plaintiff contends that the contract terms unequivocally require DOE to accept and dispose of short-cooled fuel.  *See* ECF No. 45 at 11–12.  Conversely, Defendant argues that the contract requires fuel to be cooled for at

---

[8] On March 28, 2022, Plaintiff moved for leave to file a notice of subsequent authority on the issue of judicial estoppel, attaching a recent decision in *Duke Energy Progress, LLC v. United States*, No. 18-891C (Fed. Cl. Mar. 28, 2022), in which Judge Meyers also rejected a similar argument by the Government.  *See* Pl.'s Mot. for Leave to File Notice of Subsequent Auth., ECF No. 56.  Because the Court independently reached the same conclusion without the need to consider *Duke Energy*, and seeing no reason to delay this opinion, Plaintiff's motion will be denied as moot.

least five years after being discharged before it must be accepted by DOE under OFF. *See* ECF No. 46 at 21–22. Under its interpretation, Defendant argues that Mr. Graves' model must be rejected as a matter of law because it assumes hypothetical acceptance of VYNPS' short-cooled fuel through the exchanges market in contradiction to the plain language of the Standard Contract. *See id.* at 21. Because the parties' arguments are related, the Court will analyze the issues together.

"Contract interpretation is a question of law." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1368 (Fed. Cir. 2004). Like statutory interpretation, a court's interpretation of a contract "begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). "If the terms of a contract are clear and unambiguous, they must be given their plain meaning." *Barron Bancshares*, 366 F.3d at 1375; *see also Harris v. Dep't of Veterans Affs.*, 142 F.3d 1463, 1467 (Fed. Cir. 1998) (observing that the words of a contract are given their ordinary meaning "unless the parties mutually intended and agreed to an alternative meaning"). When presented with a question of interpretation, a court must consider the contract "as a whole," giving meaning to all its parts such that no portion is rendered "useless, inexplicable, void, or superfluous." *NVT Techs.*, 370 F.3d at 1159 (citations omitted).

Based on the language of the Standard Contract, DOE's obligation to accept short-cooled fuel is clear and unambiguous. Appendix E of the contract classifies three categories of SNF: (1) standard fuel, which means SNF meeting all the general specifications set forth later in the appendix; (2) nonstandard fuel, which is defined as SNF that does not meet one or more of the general specifications; and (3) failed fuel, which means SNF that meets certain of the general

specifications as well as certain additional criteria.[9]  DA 143.  For fuel to be considered standard, one of the general specifications imposes a minimum cooling time of five years.  DA 144.  Fuel that is cooled less than five years is classified as "Nonstandard Fuel--Class NS-3."  *Id.*; *see* DA 145 (summarizing all SNF classifications, including four other classes of nonstandard fuel).

Articles V and VI of the Standard Contract define the parties' delivery/acceptance and disposal obligations with respect to SNF, as defined in Appendix E.  Under section A of Article V ("Delivery of SNF and/or HLW"), the contract requires utilities to deliver to DOE, and DOE to accept, the SNF "described in accordance with Article VI.A."[10]  DA 111.  Under Section A of Article VI ("Criteria for Disposal"), DOE is required to accept "only such SNF . . . which meets the General Specifications for such fuel" in Appendix E.  DA 114.  This section further provides that "DOE's obligation for disposing of SNF under this contract also extends to *other than standard fuel*," which includes both nonstandard and failed fuels under Appendix E.  DA 115 (emphasis added).  However, unlike standard fuel that meets all the general specifications, this latter provision qualifies DOE's acceptance obligation.  Specifically, it requires a utility to "obtain delivery and procedure confirmation from DOE prior to delivery" of other than standard fuel.  *Id.*  Upon receiving a confirmation request, DOE has 60 days to advise the utility "as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services."  *Id.*

Defendant recognizes that DOE's obligation to dispose of SNF under the Standard Contract extends to other than standard fuel.  *See* ECF No. 46 at 23.  It argues, however, that DOE's

---

[9]  Appendix E also acknowledges that fuel "may have 'Failed Fuel' and/or several 'Nonstandard Fuel' classifications."  DA 143.

[10]  Article V goes on to provide the procedures utilities must use to obtain approved DCSs, final delivery schedules, and exchange requests.  DA 112–14.

obligation is not unqualified because acceptance is conditioned on confirmation and technical feasibility. *Id.*; *see* ECF No. 48 at 15–16. The Court agrees. That the Standard Contract imposes additional procedures and approval based on DOE's technical feasibility determination does not appear to be in debate, nor could it be given the plain language of the provision. *Compare* ECF No. 48 at 15–16, *with* ECF No. 49 at 11–13. Instead, the parties primarily dispute what effect those conditions have on the timing for DOE to accept other than standard fuel and whether Mr. Graves' model must be rejected as a matter of law because it is inconsistent with those conditions.

Taking those issues in turn, the Court disagrees that "the Standard Contract makes no commitment as to *when* DOE must accept short-cooled fuel." ECF No. 46 at 23 (emphasis in original). To adopt such argument would allow the conditions of DOE's accepting other than standard fuel to swallow the acceptance obligation itself. As Plaintiff notes, the contract language could not be clearer: "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel," which includes short-cooled fuel. DA 115; *see* ECF No. 47 at 20. That obligation may come with additional conditions not imposed on standard fuel, but the plain language of the contract cannot be fairly read to absolve DOE of any disposal timetable. Indeed, the conditions are themselves limited, especially as compared to other approval requirements in the contract that are explicitly left to DOE's sole discretion (such as approving exchange requests). *Compare* DA 115, *with* DA 113. The conditions define the standards by which DOE will exercise its discretion in reviewing delivery and procedure confirmation requests for other than standard fuel—*i.e.*, approval decisions are to be based on technical feasibility and a disposal schedule adjustment is permitted if DOE identifies technical feasibility concerns. DA 115. Absent the need

for an adjustment, the contract language contemplates the disposal of other than standard fuel "on the currently agreed to schedule."[11] *Id.*

Other judges of this court have rejected similar attempts by Defendant to undermine the obligation set forth in the same provision of Article VI, Section A in cases involving failed fuel, which also is classified as other than standard fuel under Appendix E. *See, e.g.*, *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 400–01 (2006) (rejecting argument that a utility "failed to meet its burden of establishing when DOE was obligated to accept [PG & E's] failed fuel . . . because it is possible that PG & E's failed fuel would not have been accepted upon the [standard] OFF queue")), *aff'd in part, rev'd in part and remanded*, 536 F.3d 1282 (Fed. Cir. 2008); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 310–12 (2006) (holding that the relevant provision "may not be fairly construed to indefinitely defer or postpone disposal" of failed fuel), *aff'd in part, rev'd in part and remanded*, 536 F.3d 1268 (Fed. Cir. 2008). Defendant attempts to distinguish failed fuel cases. It argues that short-cooled fuel—unlike failed fuel—will become standard fuel simply by the passage of time. *See* ECF No. 50 at 14. But the Standard Contract draws no distinctions in the treatment of the various subclassifications of other than standard fuel, either among the classes of nonstandard fuel or between nonstandard fuel and failed fuel. *See* ECF No. 47 at 20 (noting that "[t]here is no carve out exception in the [contract] for short-cooled, Class NS-3 fuel").

The Court likewise disagrees with Defendant's claim that the Standard Contract requires SNF to be cooled for a minimum of five years before it can be accepted under OFF. ECF No. 46 at 22. This argument relies primarily on Defendant's contention that interpreting the contract to

---

[11] Under the Standard Contract, the only procedures for the parties to agree to a delivery schedule are set forth in Article V, and include the approved DCS, final delivery schedule, and exchange request procedures. DA 112–13.

the contrary would render the general specification for minimum cooling—which leads to a classification of either standard or nonstandard—superfluous. *Id.* at 23, 25; ECF No. 50 at 14. Because short-cooled fuel is the only other than standard fuel that will eventually become standard, Defendant describes the Class N-3 designation as "a placeholder designation" and the minimum cooling time as a "requirement" that DOE can enforce to avoid accepting short-cooled fuel. *See* ECF No. 50 at 15 & n.10. But again, as Defendant conceded at oral argument, nowhere in the Standard Contract does it say that DOE can *refuse* to accept short-cooled fuel. *See* ECF No. 55 at 38:10–14. Short-cooled fuel is classified as other than standard fuel, and thus is within the scope of DOE's disposal obligations. *See* DA 115. This interpretation does not render the minimum cooling specification "useless, inexplicable, void, or superfluous," *Gould*, 935 F.2d at 1274, because the plain language of the Standard Contract does not treat standard fuel and short-cooled fuel indistinguishably. Rather, fuel that receives a Class NS-3 (short-cooled fuel) designation is subject to the additional conditions stated in the other-than-standard-fuel provision of Article VI.A, which *do not* apply to standard fuel. DA 114–15. That provision permits DOE to adjust a delivery schedule for other than standard fuel, including short-cooled fuel, or (if there are no technical feasibility issues) to accept such fuel "on the currently agreed to schedule." DA 115. Thus, to adopt Defendant's argument, the Court either would have to (a) read into the other-than-standard-fuel disposal obligation an exception for short-cooled fuel that simply is not there, or (b) construe the Class NS-3 designation as a placeholder where nothing indicates in the contract that it should be treated any differently than the other classes of nonstandard fuel.[12]

---

[12] If DOE intended to assign short-cooled fuel only a placeholder classification without imposing any disposal obligation, it easily could have classified such fuel in its own category under Appendix E that recognized the interim nature of its other-than-standard-fuel status.

Defendant cites to several cases that it contends "reiterate[] the five year cooling minimum as required by the Standard Contract and understood by DOE and industry officials." ECF No. 46 at 24 (citing, among other cases, *Wis. Elec. Power Co. v. United States*, 90 Fed. Cl. 714, 729–30 (2009)). Upon the Court's review, the references in the cited decisions were generally made in passing without any meaningful discussion, and Defendant has not provided this Court with any of the underlying exhibits or testimony cited in the decisions such that the Court can conduct its own review. Moreover, as Plaintiff points out, the question of DOE's acceptance of short-cooled fuel does not appear to have been at issue in any of the cited decisions, and thus their persuasive value is not entirely clear. *See* ECF No. 47 at 22 n.12. In short, if Defendant purports that DOE intended the Standard Contract to exclude any disposal obligation for short-cooled fuel (notwithstanding the plain language), it has failed to provide this Court with evidence demonstrating such intent.

Turning to Plaintiff's current damages model, Defendant claims that Mr. Graves effectively "models a but-for world where short-cooled fuel is accepted by DOE as if it were standard fuel" and therefore his model should be rejected as a matter of law. ECF No. 46 at 24; *id.* at 25 ("In fact, the Graves model does not account for DOE involvement at all when it comes to accepting short-cooled fuel, including allowing the approval process to unfold or an altered timeline to be worked out."). Plaintiff disputes Defendant's characterization, citing to two expert reports it intends to offer which opine that it would have been technically feasible for DOE to accept short-cooled fuel "in the manner and under the schedule alleged by [Plaintiff]." ECF No. 47 at 21 (quoting Report of Eileen Supko at 5, ECF No. 47-6); *see id.* at 20–21 (citing Report of Earl Easton, ECF No. 47-5). The Court agrees with Plaintiff that any challenges to the assumptions on which the Graves model relies—specifically, whether it was technically feasible to accept short-cooled

fuel and what, if any, adjustment to the delivery schedule would be necessary—present a genuine dispute as to material facts that cannot be appropriately decided on summary judgment. *See id.* at 20; *see Dairyland Power*, 645 F.3d at 1371 (rejecting challenge to a utility's exchanges-based model that included acceptance of failed fuel and noting that "whether the 'causal chain' is sufficiently well-formed is one of fact").

Accordingly, the Court grants in part Plaintiff's Motion for Partial Summary Judgment and denies in part Defendant's Motion for Partial Summary Judgment as to the question of whether the Standard Contract obligates DOE to accept and dispose of short-cooled fuel, subject to certain conditions.  The Court further denies Defendant's motion to the extent it requests that the Court reject Plaintiff's exchanges-based model as a matter of law as being inconsistent with this obligation.

## V.    The Plain Language of the Standard Contract Limits Utilities to Exchanging Only Approved DCSs.

Defendant raises an additional question of contract interpretation.  It argues that the exchanges provision of the Standard Contract "allows utilities to trade [only] *approved DCSs*" subject to certain timing constraints and advance approval of DOE," an obligation for which it contends Mr. Graves' model does not account.  ECF No. 46 at 26 (emphasis in original); *id.* at 27–28.  In its opposition brief, Plaintiff does not contest Defendant's interpretation, and it confirms that Mr. Graves' "opinions do not depend upon utilities exchanging anything other than approved DCS's under the Standard Contract, nor does he fail to 'account' for DOE's role."  ECF No. 47 at 23–24 (emphasis in original).

The Court agrees with the parties' reading of the exchanges provision, which plainly provides that utilities "shall have the right to exchange *approved delivery commitment schedules*" with other contract holders.  DA 113 (emphasis added).  As the parties also agree, whether and

how Mr. Graves' model addresses this approval requirement involves a genuine dispute as to material facts that cannot be resolved on summary judgment. *See* ECF No. 50 at 15; ECF No. 47 at 28. Accordingly, the Court grants Defendant's request for summary judgment with respect to the exchanges-provision issue, but only as to the legal question of contract interpretation.

## VI. Defendant Has Not Demonstrated that Payments Made by Plaintiff to the Town of Vernon under the Tax Stabilization Contract Were Unforeseeable as a Matter of Law.

Defendant challenges whether payments that it characterizes as "voluntary subsidies" made by Plaintiff to the town of Vernon, Vermont ("Town"), were reasonably foreseeable and therefore recoverable. ECF No. 46 at 28–30. Although the payments were made pursuant to a Tax Stabilization Contract ("TSC") executed by Plaintiff and the Town, Defendant claims that Plaintiff—acting as a "good corporate citizen"—"agreed to subsidize the town" in an effort to prepare the Town for the lower tax revenues it would collect following the shutdown of VYNPS. *Id.* at 29–30 (citation omitted). According to Defendant, DOE could not have foreseen that "a utility might negotiate a contract to pay specific amounts to a municipality" for such purpose. *See* ECF No. 50 at 16.

Plaintiff, on the other hand, argues that these payments represent property tax costs directly related to the value of the SNF being stored at the facility, which is a type of cost that has been routinely awarded in other SNF cases. *See* ECF No. 47 at 24 (citing *Entergy Nuclear Indian Point 2, LLC v. United States*, 128 Fed. Cl. 526, 533 (2016); *Sys. Fuels, Inc. v. United States*, 120 Fed. Cl. 737, 759–62 (2015); *Sys. Fuels, Inc. v. United States*, 70 Fed. Cl. 37, 68–70 (2007), *rev'd in part on other grounds*, 457 F. App'x 930 (Fed. Cir. 2012)).

For damages to be recoverable in a breach of contract claim, they must be, among other things, "reasonably foreseeable by the breaching party at the time of contracting." *Ind. Mich. Power*, 422 F.3d at 1373. A plaintiff must prove foreseeability with respect to the type and

magnitude of the damages sought. *Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that *actually occurred* was not foreseeable." *Old Stone Corp. v. United States*, 450 F.3d 1360, 1376 (Fed. Cir. 2006) (emphasis in original) (alteration omitted) (quoting Restatement (Second) of Contracts § 351 cmt a. (1981)); *see Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1364 (Fed. Cir. 2010). "Remoteness in space and time and the number of intervening events have obvious bearing on foreseeability." *Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC* ("*Vermont Yankee*"), 683 F.3d 1330, 1344 (Fed. Cir. 2012).

Defendant does not dispute that property taxes associated with a utility's construction of on-site dry storage facilities was foreseeable at the time the Standard Contract was signed, nor does it dispute that Plaintiff could not have ceased paying property taxes to the Town after VYNPS shut down. *See* ECF No. 47 at 24, 27–28; ECF No. 50 at 16. Relying on *Vermont Yankee*, Defendant contends that Plaintiff's payments to the Town are not recoverable as a matter of law. *See* ECF No. 46 at 28; ECF No. 50 at 16. It emphasizes that Plaintiff made these payments pursuant to a private agreement with the Town "in lieu of the annual Municipal Services Property Tax[]," ECF No. 46 at 29 (alteration in original), for an amount "not determined based on a formula considering the assessed value of specific property," ECF No. 50 at 16, and with the intention of "easing the impact on the town of a plant shutdown," *id.* According to Defendant, it is "the mechanism by which the payment[s] came to be made" that makes them unforeseeable. ECF No. 55 at 49:7–8.

*Vermont Yankee*, however, did not turn on the *manner* by which ENVY incurred the costs—*i.e.*, by agreement versus by operation of law. It turned on the *type* of costs incurred. *See*

*Vt. Yankee*, 683 F.3d at 1344; *see also Anchor Sav. Bank*, 597 F.3d at 1364 (general principles of contract damages do not "impose a restrictive test of foreseeability in which the specific mechanism of loss must be foreseeable").   In *Vermont Yankee*, which was an appeal taken in round one, the Federal Circuit held that certain costs incurred by Plaintiff's predecessor, Entergy Nuclear Vermont Yankee ("ENVY"), to obtain the Vermont legislature's approval to build the first on-site dry storage facility at VYNPS were foreseeable, while others were not.   *Vt. Yankee*, 683 F.3d at 1343–44.   The Court noted that, at the time the then-owner of VYNPS executed the Standard Contract in 1983, state law required legislative approval for a utility to construct a storage facility for SNF.   *Id.* at 1343.   Although the then-owner enjoyed a company-specific statutory exemption, the Court held that it was not unforeseeable that the future owner (*i.e.*, EVNY) would need to obtain the required approval and, as a result, incur at least some legal and lobbying fees. *Id.* at 1346.   However, the Court reached a contrary conclusion regarding the money ENVY contributed to Vermont's Clean Energy Development Fund, which was a condition of the legislature's approval.   *Id.*   As the Court explained, the fund was not created until 2005, the payments ENVY made into the fund concededly had nothing to do with dry cask storage of SNF at VYNPS, and the Court expressed serious concerns that Vermont's requiring such contributions was preempted by federal law.   *Id.* at 1346–47.   In other words, this particular *type* of cost was not foreseeable and thus not recoverable.   *Id.* at 1344 (citing *Landmark Land*, 256 F.3d at 1378).

Despite Defendant's attempt to draw a parallel between the non-recoverable clean energy fund contributions to the state in *Vermont Yankee* and the payments to the Town in the instant case, the two types of payments are not comparable.   *See id.* at 1347 (emphasizing that non-recoverable fund payments were "particularly unforeseeable" given they were likely unconstitutional). Moreover, Defendant has not demonstrated the absence of a genuine dispute as to the material

facts necessary to determine whether the payments to the Town are a type of cost that was foreseeable.  Although the TSC indicates the payments were made in lieu of the annual property tax, Plaintiff points to the testimony of its tax officer, Cory Gruntz, who stated that the "[t]he purpose of the negotiations was 'to come up with a suitable assessed value [of VYNPS property] that resulted in *tax payments* that [both parties] could live with.'"  ECF No. 47 at 25 (emphasis added) (quoting Dep. Tr. of Cory Gruntz ("Gruntz Tr.") at 97:2–16, ECF No. 47-9); *see Vt. Yankee*, 683 F.3d at 1345 (contrasting non-recoverable fund payments with foreseeable "adverse tax consequences of the plaintiffs' mitigation activities").  The payments were remitted with tax bills issued to Plaintiff by the Town.  *See* DA 1–3.

Although the tax payments were not based on the grand list's assessed value, Plaintiff notes that the Town performed an assessment and assigned a value of $78 million directly related to the dry storage facilities at VYNPS.[13]  ECF No. 47 at 26 (valuing "all property in the ISFSI" at $58 million and the "real property, land and buildings . . . used as part of the ISFSI and [SNF] preparation and storage" at $20 million (quoting DA 7)); *see Vt. Yankee*, 683 F.3d at 1346 (observing that non-recoverable fund payments "bore no relationship to any costs incurred . . . as a result of the construction of the dry storage facility").  Mr. Gruntz further testified that "the absence of an ISFSI would 'have changed the negotiated value in place during the period of the [TSC]."  ECF No. 47 at 26; *see* ECF No. 47-9 at 16 (Gruntz Tr. at 151:16–22).  And although Mr. Gruntz agreed that Plaintiff's negotiation position considered the impact on the Town of an immediate drop in Plaintiff's tax payments, he also explained that his primary goal in the

---

[13] The assessed value of $78 million appears to be the same as the grand list value used for the Statewide Education Tax payments, which Defendant does not challenge on foreseeability grounds.  *See* DA 9; ECF No. 50 at 15–16.

negotiations "was to get the best economic outcome for the company and to minimize the property taxes" paid.  ECF No. 47-9 at 7 (Gruntz Tr. at 41:3–5); *id.* at 14 (Gruntz Tr. at 130:14–131:12).

The Court does not rule out that Defendant may present at trial additional evidence that calls into question whether the payments to the Town reasonably can be construed as a foreseeable mitigation of Plaintiff's tax liability, as Plaintiff claims.  *See Anchor Sav. Bank*, 597 F.3d at 1364 (noting that general principles limit damages where "the loss that actually occurred was not foreseeable" or "when unforeseeable events result in enhanced losses to the non-breaching party").  However, giving credit to Plaintiff's evidence, as the nonmovant, the Court finds that Defendant has not shown that these payments were unforeseeable as a matter of law, and thus its request for partial summary judgment in that regard must be denied.

## VII. Defendant Has Not Demonstrated that Plaintiff's Pre-2017 Site Security Costs Are Not Recoverable as a Matter of Law.

Defendant claims Plaintiff's pre-2017 site security costs are not recoverable because they would have been incurred, irrespective of DOE's partial breach, as part of Plaintiff's regulatory security plan requirements.  ECF No. 46 at 30–31 (citing 10 C.F.R. § 73.55).  These costs total approximately $10,174,208 for 48 security personnel charged with securing the original protected area at VYNPS, which included both the ISFSI and the spent fuel pool.  *See id.* at 30 (citing DA 170).  Plaintiff contends that it is not obligated to demonstrate that the total number of security personnel would have increased because of DOE's breach in order to recover the claimed security costs.  *See* ECF No. 47 at 29.  Rather, relying on Federal Circuit decisions approving recovery of overhead costs in SNF cases, it argues that Plaintiff may recover a properly allocated percentage of the total security costs assigned to the ISFSI Project.  *See id.* at 28.  The Court agrees that, notwithstanding the regulatory requirements, Plaintiff's recovery of security costs is not precluded as a matter of law.

The Federal Circuit has repeatedly approved awards in SNF cases for overhead costs that are fairly allocated to support mitigation efforts. *See, e.g.*, *Energy Nw. v. United States*, 641 F.3d 1300, 1309 (Fed. Cir. 2011). These types of indirect costs include "certain overhead services that [a utility] provide[s] for the benefit of *all its operations* (not only its mitigation activities)." *Id.* at 1311 (emphasis added). Examples of non-mitigation-specific expenses awarded in SNF cases include "administrative, management, information services, and resource development expenses," *id.* at 1304, as well as costs of "plant security [and] emergency response systems," *So. Cal. Edison Co. v. United States*, 655 F.3d 1319, 1321 (Fed. Cir. 2011). To demonstrate recoverability, a utility need not prove that "overhead costs actually . . . increased over the non-breach world." *Energy Nw.*, 641 F.3d at 1309. Nor is it dispositive that the claimed costs otherwise would have been incurred as a result of normal business operations. *See So. Cal. Edison*, 655 F.3d at 1322. Rather, having established that mitigation efforts were undertaken as a result of DOE's breach, utilities are "entitled to prove the amount of the associated cost (including both direct and indirect costs) by whatever reasonable techniques are available." *Energy Nw.*, 641 F.3d at 1309. One such way is through allocation of overhead costs to mitigation activities on a percentage basis. *See So. Cal. Edison*, 655 F.3d at 1322 (holding that allocation of indirect overhead costs to a utility's ISFSI project was not erroneous because, if not, other projects and facility operations "would support an unequal share of the overhead costs" (alteration omitted) (citation omitted)).

Consistent with that precedent, whether Plaintiff can recover the pre-2017 security costs it assigns to the ISFSI Project involves a genuine dispute as to material facts. *See* ECF No. 47 at 29; *see also Energy Nw.*, 641 F.3d at 1309 (agreeing that an "award of damages for overhead costs is a factual question of the damages amount, not a legal question of causation"). To support its damages claim for security costs, Plaintiff produced a white paper prepared by VYNPS security

management prior to the facility shutting down in 2014.  *See* DA 79–83.  The paper projects the sitewide security costs to be incurred at VYNPS through (and beyond) the current claim period and allocates such costs between three categories of activities: (1) Independent Spent Fuel Storage, (2) Spent Fuel Management (*i.e.*, the pool), and (3) License Termination.  *See* DA 79; *see also* DA 55 (Dep. Tr. of Patrick Ryan ("Ryan Tr.") at 17:4–11).  Through 2016, the paper estimates that 48 security personnel out of VYNPS' total security staff should be allocated to the ISFSI Project.  *See* DA 83.  This accounts for 43–55 percent of Plaintiff's total security costs.  *Id.*  According to Patrick Ryan, Plaintiff's site security manager, this figure was chosen because 10 C.F.R. § 73.55 required Plaintiff to maintain a team of 48 security personnel responsible for protecting the entirety of the facility's protected area, which included the ISFSI.  DA 60–63 (Ryan Tr. at 39:22–42:19).  Mr. Ryan acknowledged, however, that the regulation required 48 security personnel to be assigned to the protected area regardless of the construction of the ISFSI.  DA 74–75 (Ryan Tr. at 74:21–75:4); *see* DA 73 (Ryan Tr. at 73:7–10) (explaining that if all the SNF had not been relocated to the ISFSI and remained in the pool the required number of security personnel would actually increase by one).

Although these facts will unquestionably be relevant to determining whether Plaintiff has shown a sufficient basis upon which the Court can be "reasonably certain that the claimed damages were caused by the breach," *Energy Nw.*, 641 F.3d at 1309, it does not establish that the claimed pre-2017 site security costs are non-recoverable in their entirety as a matter of law.  *See ENVY*, 95 Fed. Cl. at 183 ("Reasonable certainty also is a question of fact." (citing *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1356–58 (Fed. Cir. 2001))).  Instead, factual presentation is necessary for the Court to determine whether Plaintiff's allocation of security costs to its mitigation activities during the current claim period is supportable and sufficiently related to DOE's breach.

*See Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1311 (Fed. Cir. 2012) (explaining that "'the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision,' [but that] recovery for speculative damages is precluded.'" (quoting *Ind. Mich. Power*, 422 F.3d at 1373)); *So. Cal. Edison*, 655 F.3d at 1322.

Accordingly, the Court denies Defendant's Motion for Partial Summary Judgment with respect to Plaintiff's pre-2017 site security costs.

## CONCLUSION

For these reasons, Plaintiff's Motion for Partial Summary Judgment and Entry of Partial Final Judgment (ECF No. 45) is **GRANTED IN PART** and **DENIED IN PART**, and Defendant's Motion for Partial Summary Judgment (ECF No. 46) is **GRANTED IN PART** and **DENIED IN PART**.  Further proceedings will be scheduled in a separate order.

**SO ORDERED**.

Dated:  April 21, 2022                    _____*/s/ Kathryn C. Davis*_____
                                          KATHRYN C. DAVIS
                                          Judge